## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ERIK A. KUBIK**

     **Plaintiff,**     **CIVIL ACTION NO. 06-CV-12201-DT**

  **vs.**         **DISTRICT JUDGE BERNARD A. FRIEDMAN**

**COMMISSIONER OF**     **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

     **Defendant.**
_____/

### I.  REPORT AND RECOMMENDATION

   This Court recommends that Defendant's Unopposed Motion for Summary Judgment (Docket # 14) be **GRANTED** and that Plaintiff's complaint be **DISMISSED**.

### II.  PROCEDURAL HISTORY

   This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382.  The issue for review is whether the Commissioner's decision is supported by substantial evidence.

   Plaintiff Erik Kubik filed an application for Disability Insurance Benefits ("DIB") on March 19, 2003.  (Tr. 39-41, 45-52).  He alleged he had been disabled since May 5, 2002 due to an inability to engage in prolonged walking, lifting, or climbing stairs as a result of a spinal injury.  *Id*. Plaintiff's claim was initially denied.  (Tr. 23-27).  Plaintiff sought a review hearing before an Administrative Law Judge (ALJ).  (Tr. 28).  A hearing took place before ALJ Larry Parker on July 26, 2005.  (Tr. 166-86).  Plaintiff was represented by an attorney at the hearing.  (Tr. 22, 167).  The ALJ denied Plaintiff's claim in a written opinion issued on September 18, 2005.  (Tr. 9-21).  The

Appeals Council denied review of the ALJ's decision on March 10, 2006 and the ALJ's decision is now the final decision of the Commissioner.  (Tr. 3-8).

Plaintiff, acting *in pro per*, filed a complaint with this Court appealing the denial of his claims on May 12, 2006.  (Docket # 1).  On October 17, 2006 this Court issued a Scheduling Order directing Plaintiff to file a Motion for Summary Judgment by November 17, 2006.  (Docket # 11).  Plaintiff did not file a Motion or seek an extension of time to do so.  The Scheduling Order was amended once at Defendant's request and Defendant subsequently filed its Motion for Summary Judgment on January 17, 2007 (Docket # # 12-14).  Plaintiff's Reply to Defendant's Motion was due on or before January 29, 2007 but no reply was ever filed.  When no pleadings were received from Plaintiff as of January 29, 2007, this Court issued an Order to Plaintiff to show cause for his failure to comply with the Court's Scheduling Order.  (Docket # 15).  Plaintiff's response to the Order to Show Cause was due on or before February 9, 2007.  Plaintiff filed no response.  The Scheduling Order provides for review upon the merits whether or not briefs were filed.  Thus, this Report and Recommendation is prepared based on Plaintiff's complaint and Defendant's unopposed Motion for Summary Judgment.

III.   **MEDICAL HISTORY**

Plaintiff was hospitalized in May 2002 after he was hit by a car while riding his motorcycle.  (Tr. 109, 130).  Plaintiff had no loss of consciousness.  Plaintiff's primary complaint was an inability to move his legs.  He also had upper back pain, shoulder pain, and respiratory distress.  An MRI showed multiple fractures involving ligamentous and bony injuries

to Plaintiff's lower cervical and upper thoracic spine. (Tr. 113-14, 130-31). An epidural

hematoma was displacing the thoracic spinal cord anteriorly and to the left of the midline. There

was moderate disc space narrowing at T2-T3 but no evidence of a herniated disc. There was also

significant cord compression seen. (Tr. 114).

Plaintiff underwent a thoracic laminectomy and fusion with instrumentation on May 20,

2002 performed by Dr. Frank Schinco. (Tr. 131). Post-operatively Plaintiff was stable and

afebrile with no complications. *Id.* A post-surgical CT scan of Plaintiff's lower cervical and

upper thoracic spine showed stabilization of Plaintiff's multiple fractures with satisfactory spinal

alignment. (Tr. 110-11). Medical records reveal that post-surgery, Plaintiff had prolonged

hyperglycemia for which he was treated with insulin and other medication. (Tr. 131). Plaintiff

had re-gained full motor capacity of his right leg but only partial mobility in his left leg.

Plaintiff's upper extremities were normal in tone, strength, and sensation. (Tr. 133).

Plaintiff was subsequently transferred from the hospital to an in-patient rehabilitation

center for comprehensive therapy on May 25, 2002. (Tr. 132-35). Upon admission it was noted

that Plaintiff was on various medications, including an anti-depressant, an anti-inflammatory, a

muscle relaxant, an anti-hyperglycemic, and a narcotic pain reliever. (Tr. 133). Plaintiff's

primary complaint was bilateral leg weakness and mild to moderate back pain. (Tr. 134).

Plaintiff required minimal to moderate assistance for position transfers and minimal assistance

for lower extremity dressing and bathing. *Id.* An examination showed that Plaintiff had a

limited range of motion in his lower extremities. *Id.*

Plaintiff was examined on May 27, 2002. He reported that he was "doing 'all right'" but

had intermittent back pain. Plaintiff stated that his mood varied and that he felt very depressed at

-3-

times due primarily to his limited mobility.  Plaintiff's depression was transitory and lasted for only 1 to 2 hours.  (Tr. 128).  Plaintiff reported that he slept fairly well and that his appetite was fair.  *Id.*  During the evaluation, the treating psychologist/psychiatrist noted that Plaintiff was somewhat withdrawn, avoided eye contact, and had a depressed mood.  His speech was of a normal rate but reduced in volume with almost no spontaneity and his affect was flat.  (Tr. 129).  The doctor concluded that Plaintiff had an adjustment disorder with a depressed mood.  No recommendations were made as the doctor believed Plaintiff was still adjusting to his new environment.  The doctor indicated that he would re-examine Plaintiff in a few days.  *Id.*

Another examination took place on June 7, 2002.  (Tr. 125-27).  The report notes that there was concern that Plaintiff might be suffering from a brain injury caused by his accident.  (Tr. 125).  Plaintiff reported that he did not notice any problems with his train of thought, word finding ability, short-term memory, or his sense of taste or smell.  *Id.*  Plaintiff described his energy level and mood as "all right."  He was oriented as to time, place, and person.  (Tr. 126).  The psychologist/psychiatrist concluded that Plaintiff's current condition was likely due to reactive depression in combination with his history of learning disabilities and special education, which was unrelated to his traumatic brain injury.  (Tr. 127).

Plaintiff was discharged from the rehabilitation center on June 19, 2002.  The discharge summary noted that Plaintiff's neurogenic bladder involving urinary retention  had resolved and that he had good continence of bladder.  Plaintiff's neurogenic bowel involving constipation was resolving with the assistance of medication.  The report also revealed that Plaintiff's depression had improved throughout his hospitalization as had his musculoskeletal complaints.  (Tr. 122-23).  As to Plaintiff's functional status, he was able to walk for 150 to 200 feet with a walker and

-4-

to climb up and down 5 steps with stand-by assistance.  Plaintiff required slight to minimal assistance for upper extremity dressing and lower extremity bathing, moderate assistance for lower extremity dressing, and slight to minimal assistance with his shoes.  (Tr. 123).  Plaintiff was discharged with various medications, including Glipizide, Vicodin, Senna, Peri-Colace, Pepcid, and Zoloft.  (Tr. 122).  He was instructed to follow-up with his primary care physician, Dr. Schinco, and the rehabilitation specialist to set up further appointments.[1]  (Tr. 124).

In July 2002 Dr. Schinco reported that Plaintiff's condition had improved since his thoracic laminectomy and fusion.  Plaintiff could walk and his leg muscle strength was good with 5/5 on the left and 4/5 on the left.  There was no numbness noted.  Dr. Schinco noted that he was pleased with Plaintiff's progress and that if x-rays showed good progress then Plaintiff could stop wearing his back brace.  (Tr. 109).  Subsequent x-rays showed stabilization of the upper thoracic spine and a normal lower thoracic spine.  (Tr. 108, 121).

Dr. Schinco reported in August 2002 that Plaintiff showed continued improvement.  (Tr. 107).  Plaintiff's left leg strength was almost normal.  *Id.*  An examination revealed that Plaintiff's legs showed no evidence of weakness and no hyperflexia.  Plaintiff's sensations were normal with 2+ reflexes.  Cerebellar and gait testing was normal.  *Id.*  Dr. Schinco noted that he would gradually wean Plaintiff off of his back brace.  *Id.*

X-rays taken of Plaintiff's thoracic spine in September 2002 showed that Plaintiff's upper thoracic spine was stabilized.  Bony alignment was normal and no post-operative complications were identified.  (Tr. 106, 120).

---

[1]     The record contains a few reports from Plaintiff's primary care physician dated February to May 2003 that primarily relate to Plaintiff's treatment for diabetes.  (Tr. 136-43).

Dr. Schinco saw Plaintiff in November 2002 for a follow-up visit.  (Tr. 105).  Plaintiff reported that he had some discomfort in the bilateral scapular and axillary areas of his back with some diffuse weakness in the left arm and leg.  An examination showed minimal back tenderness.  Dr. Schinco could find no specific motor weakness, sensory deficit, or reflex asymmetry.  Dr. Schinco recommended continued conservative treatment and again noted that he was pleased with Plaintiff's progress.  *Id.*

In April 2003 Plaintiff was involved in another motor vehicle accident.  (Tr. 117-18).  Plaintiff had no loss of consciousness at the scene and he was ambulatory but he experienced an acute onset of upper back pain at the site of his previous spinal surgery.  He denied any abdominal pain, chest pain, hearing or vision loss, depression, dysarthria, dysuria, fever, hemoptysis, or any incontinence of urine or stool.  Plaintiff also denied numbness, tingling, weakness, or leg pain.  *Id*.  An examination showed 5/5 muscle strength in Plaintiff's bilateral upper and lower extremities with normal reflexes and sensation.  Some pain was noted at the site of Plaintiff's prior thoracic injuries but no bony prominences, swelling, or bruising was noted.  Tenderness was noted on the paraspinous muscles next to the surgical site, which was greater on the left side.  Plaintiff could raise his hands above his head without shoulder pain.  *Id.*  An x-ray taken of Plaintiff's thoracic spine showed the presence of prior thoracic spine stabilization hardware.  There was no evidence of an acute fracture or other abnormalities.  (Tr. 115-16, 118).  It was determined that Plaintiff had an acute muscle strain at the site of his previous surgery.  Plaintiff was advised to follow-up with his primary care physician and was advised to take Motrin 600 mg as needed for pain and Norflex as needed for  muscle spasms.  (Tr. 118).

In May 2003 Dr. Schinco saw Plaintiff for a neurological follow-up appointment.  He noted that he had not seen Plaintiff since November 2002 as Plaintiff's spinal cord injury had improved dramatically to an almost normal state.  (Tr. 104).  Dr. Schinco discussed Plaintiff's second automobile accident and reported that Plaintiff complained of aching discomfort in the mid and lower thoracic area of his back with stiffness in both legs, numbness in both arms, and left leg and arm weakness.  *Id.*  Dr. Schinco also noted that Plantiff had mild bladder incontinence which he had since his May 2002 accident.  *Id.*

Dr. Schinco reported that Plaintiff's medications as of May 2003 consisted of Vicodin, Pepcid, and Metformin.  (Tr. 104).  An examination showed no tenderness of the thoracic area.  Plaintiff's range of motion of the cervical, thoracic, and lumbar spine were normal.  A neurological examination showed good strength and no arm numbness.  Plaintiff had minimal leg weakness of the spastic type with hyperflexia.  *Id.*  Dr. Schinco concluded that Plaintiff's condition was "basically stable from this previous spinal cord injury."  *Id.*  Based upon these findings, Dr. Schinco recommended that Plaintiff undergo a thoracic myelography to confirm that no spinal cord injury existed.  *Id.*

A state agency medical consultant reviewed Plaintiff's medical records in August 2003 and completed a Physical Functional Residual Capacity ("RFC") form.  (Tr. 144-151).  The consultant concluded that Plaintiff had the RFC to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk for at least 2 hours in an 8-hour workday; (3) sit for about 6 hours in an 8-hour workday; and (4) occasional climbing of ladders, ropes, and scaffolds; (5) frequent climbing of ramps and stairs.  (Tr. 145-46).  The consultant also found that Plaintiff had an unlimited ability to push/pull with his upper and lower extremities, had no manipulative,

visual, or communicative limitations, and had no environmental limitations except to avoid concentrated exposure to hazards. (Tr. 147-48).

    In September 2003 Plaintiff was examined by Dr. Ann Date, a psychologist.  (Tr. 152-58).  Plaintiff reported to Dr. Date that he could not work due to various physical problems caused by his motor cycle accident.  Despite his physical problems, Plaintiff told Dr. Date that his mood was good.  (Tr. 152).  He also stated that he had received some psychological services while he was hospitalized for his injuries but that he had not previously received any psychiatric treatment.  *Id.*

    Dr. Date noted that it was easy to develop a rapport with Plaintiff and that Plaintiff was friendly and cooperative during the evaluation.  (Tr. 154).  Plaintiff reported that he got along well with his wife, family, and friends.  He also had good relationships with other people.  *Id.* Plaintiff stated that he enjoyed going to the movies.  He also did a limited amount of walking and shopping but could not do too much because his leg would give out on him.  *Id.* During a typical day, Plaintiff said that he would awake around 9 or 9:30 a.m. and shower.  Plaintiff could shower by himself but it was occasionally problematic.  Following a shower, Plaintiff dressed himself and did light housekeeping.  If he had the car, Plaintiff sometimes shopped for dinner groceries because Plaintiff liked to cook.  Plaintiff could drive a car.  Plaintiff also tried to do some exercises, including stretching and walking.  Plaintiff would then go to bed around 11 or 11:30 p.m.  Plaintiff sometime had difficulty falling asleep because he was uncomfortable and he had to wake up during the night to use the bathroom so that he did not wet the bed.  Plaintiff reported that he slept about 7 hours in a 24-hour period.  (Tr. 154-55).

During the evaluation, Dr. Date observed that Plaintiff arrived on time for his appointment. He had a slow, unstable gait, he used a cane, and had difficulty getting up and out of the chair. Plaintiff maintained good eye contact and his expressive and receptive language was normal. (Tr. 155). Plaintiff had good contact with reality, insight, and judgment. His thoughts were spontaneous, logical, and relevant. Plaintiff's affect was full and his mood was good. Plaintiff denied having any depression, anxiety, or anger. *Id.* Plaintiff could recall 5 digits forward, 3 digits backwards, and 2 out of 3 objects after 3 minutes. He could name the current president, the preceding president, and two presidents from his lifetime. Plaintiff was able to name large cities and famous people. He could not perform serial 7's, multiplication, or division. However, Plaintiff was able to perform serial 3's, addition, and subtraction. Plaintiff was also able to engage in abstract thinking, acknowledge similarities and differences between objects, and exercise judgment. (Tr. 156-57).

Dr. Date ultimately found that Plaintiff had no diagnosable mental impairments. She assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65 and stated that his prognosis was good.[2] (Tr. 158).

In October 2003 a state agency psychologist, Dr. Ronald Marshall, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form and a Mental RFC form.

---

[2]   "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed. 2000) at 32. A GAF score of 65 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

(Tr. 159-65). Dr. Marshall concluded that Plaintiff had an organic mental disorder that resulted in mild restrictions of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 165). Plaintiff had no episodes of decompensation. *Id*.

Dr. Marshall further concluded that Plaintiff was moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods of time; and (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 159-10).

## IV. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff, who was 25 years old when the ALJ rendered a written decision, testified that he had a 12th grade education with special educational programming. (Tr. 50-51, 84-103, 170, 175-76). Plaintiff told the ALJ that he sustained back injuries in a motorcycle accident that occurred on May 5, 2002. (Tr. 172). After his accident, Plaintiff was in rehabilitation, which included physical and occupational therapy, for almost two months. *Id.* Thereafter, Plaintiff participated in outpatient therapy on several occasions, which involved physical therapy. He also performed exercises at home. *Id.* Plaintiff testified that he did not see any improvement in his ability to do physical activities as a result of his rehabilitation and therapy. *Id.*

In December 2004, Plaintiff returned to work for almost six weeks but had to stop working due to severe back pain. During that time, Plaintiff took up to six pills of Vicodin a day to cope with

the pain.  (Tr. 171-73).  At the time of the hearing, Plaintiff took Vicodin as needed but mostly relied on a Duragesic patch for pain relief.  (Tr. 173).

Plaintiff further testified that Dr. Schinco had imposed a 15 pound lifting restriction due to his back injury.  (Tr. 173-74).  He also stated that he still experienced urinary incontinence and had to use the bathroom about 8 to 9 times a day or about every 45 minutes.  (Tr. 177-78).  Plaintiff testified that pursuant to his doctor's instructions he always used a cane for standing and stability.  (Tr. 180).  He also averaged about 7 hours of sleep in a 24-hour period.  (Tr. 180-81).


### B.        The Vocational Expert's Testimony

Mary Williams, a rehabilitation counselor, testified as a vocational expert ("VE") at the hearing.  (Tr. 37, 181-85).  Ms. Williams testified that Plaintiff could not perform his past, relevant work.  (Tr. 182).  The ALJ asked Ms. Williams to testify as to what jobs might be available for an individual of Plaintiff's age and education (including some special education)  and who: (1) had an 20-pound occasional and a 10-pound frequent weight restriction; (2) could stand and walk for more than 2 hours but less than 6 hours; (3) could sit for 6 hours in an

8-hour workday; (4) could never climb a ladder, rope, or scaffold; (5) could occasionally climb ramps or stairs; (6) should avoid concentrated exposure to all hazards; (7) was limited to simple, repetitive, unskilled tasks; (8) had moderate limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (9) had moderate limitations in the ability to maintain attention and concentration for extended periods of time.  (Tr. 182).

Ms. Williams testified that there were jobs in Michigan's lower peninsula that such an individual could perform light work, including 18,400 security guard jobs, 9,000 assembly worker jobs, and 5,600 machine operator jobs.  In the national economy, the same individual could perform 307,000 security guard jobs, 90,000 assembly worker jobs, and 75,000 machine operator jobs.  (Tr. 183).

## V.    <u>STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions.  Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also

supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

## VI.   LAW AND ANALYSIS

### A.   Framework for Social Security Disability Determinations

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)   he was not presently engaged in substantial gainful employment; and

(2)   he suffered from a severe impairment; and

(3)   the impairment met or was medically equal to a "listed impairment;" or

(4)   he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

### B.   ANALYSIS

In his complaint, Plaintiff asserts that he has chronic pain and limited mobility as a result of his May 2002 motor cycle accident which has not been remedied by treatment.  He contends that

the ALJ's decision that he was not disabled as a result of these conditions was erroneous. (Compl. at ¶¶ 7, 13). Plaintiff also states that he has continued to receive treatment for his conditions which warrants consideration of new evidence not earlier available.[3] *Id.* at ¶ 13.

The ALJ concluded at steps 1 through 3 of the sequential analysis that Plaintiff had not engaged in any substantial gainful employment during the period of closed disability and that he had a "severe" impairment consisting of a post spinal cord injury but that this impairment did not meet or equal a listed impairment. (Tr. 13-14).

Plaintiff's post spinal cord injury would fall under the listing for disorders of the spine. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The criteria for this listing requires evidence that the nerve root or spinal cord has been compromised with either: (1) nerve root compression resulting in limited range of spinal motion, motor loss (muscle weakness) accompanied by sensory or reflex loss, and, if the lower spine is involved, positive straight leg raising tests, *id.* § 1.04A; (2) arachnoiditis with severe burning or painful dysesthesia resulting in the need for postural changes more than once every two hours, *id.* § 1.04B; or (3) lumbar spinal stenosis resulting in the inability to ambulate effectively, *id.* § 1.04C.

The MRI taken after Plaintiff's May 2002 accident showed no evidence of spinal cord compression or herniated discs. Plaintiff had full motor capacity in his right leg and partial mobility in his left leg within a month after his accident. After two months, Plaintiff's muscle strength was 5/5 on the left and 4/5 on the right with no numbness. By August 2002 Plaintiff showed no evidence

---

[3]     In his complaint, Plaintiff does not challenge the ALJ's findings regarding his mental impairment of chronic brain syndrome. Therefore, the Court shall only consider whether substantial evidence supports the ALJ's findings with respect to Plaintiff's physical impairments.

of muscle weakness and his sensations, reflexes, and gait were normal. In November 2002 Dr. Schinco found no evidence of motor weakness, sensory deficit, or reflex asymmetry. Following Plaintiff's April 2003 accident, examinations showed that Plaintiff had 5/5 muscle strength bilaterally with normal reflexes and sensation. Dr. Schinco noted a full range of spinal motion, good muscle strength, and no numbness in May 2003. The Court also notes that throughout the record there is no evidence that Plaintiff suffered from arachnoiditis or lumbar spinal stenosis and there is no involvement of Plaintiff's lower back. Given this evidence as a whole, the Court concludes that the ALJ properly found that Plaintiff's post spinal cord injury did not meet or equal a listed impairment.

At the fourth step, the ALJ concluded that Plaintiff had the physical RFC for a light level of work activity[4] and that Plaintiff could not perform his past, relevant work. The ALJ's RFC finding is summarized as follows:

> The claimant can lift and carry twenty pounds occasionally and ten pounds frequently, with equivalent limitations on pushing and pulling. The claimant can sit or stand and/or walk approximately six hours in an eight-hour workday. He can occasionally climb ladders, ropes or scaffolds and frequently climb ramps or stairs as well as frequently balance, stoop, kneel, crouch or crawl and he would need to avoid concentrated exposure to work hazards such as dangerous machinery

---

[4]      "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

or unprotected heights.

(Tr. 17).

The record shows that the ALJ's assessment of Plaintiff's RFC is consistent with the uncontradicted opinion of the state agency physician whose expert opinion the ALJ was entitled to consider. *See* 20 C.F.R. § 404.1527(f)(2)(I) (state agency physician are "highly qualified physicians . . .  who are also experts in Social Security disability evaluations.").  Thus, the Court concludes that the ALJ's RFC finding was supported by substantial evidence.

Plaintiff's testimony regarding the extent of his pain and limitations, if accepted as credible, might support a finding that he is incapable of engaging in any substantial gainful activity.  However, the ALJ found that Plaintiff's testimony was not fully credible.  (Tr. 17).  Such determinations are entitled to significant deference, *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), and there is nothing in the record that would warrant disturbing the ALJ's credibility determination in this matter.

As noted above, there is no evidence in the record of any continuing muscle spasms, significant muscle atrophy, or neurological deficits after the onset date of disability, which was not alleviated by surgical intervention.  These symptoms are typical indicators of severe pain. *See Jones v. Sec'y of Health & Human Srvs.*, 945 F.2d 1365, 1369-70 (6th Cir. 1991).  There was also no evidence of nerve root impingement or spinal cord compression.   Examination findings post-surgery were essentially normal with notations  made that Plaintiff had good muscle strength, normal reflexes, intact sensation, and lack of focal deficits.  The record also shows that Plaintiff had a normal gait on occasion.  (Tr. 107, 109, 117, 130).  X-rays taken post-operatively revealed that Plaintiff had a stabilized upper thoracic spine and a normal lower thoracic spine.

Even after Plaintiff's second motor vehicle accident, x-rays showed that the fusion of Plaintiff's thoracic spine was intact with no apparent deformities.

Furthermore, the ALJ cited to Plaintiff's daily activities, including his ability to tend to his own personal care, shop, cook, do light household chores, and to drive as inconsistent with Plaintiff's assertions of disabling pain. The Court additionally notes that Plaintiff reported that he walked on the treadmill for about 20 minutes a day. (Tr. 74-76). Plaintiff's mother stated that during the day, Plaintiff watched television, played games, visited with friends, ran errands, and went to the movies on a weekly basis. (Tr. 65). He cared for household pets and went to church twice a month. (Tr. 66, 69). Plaintiff also left the house every day. (Tr. 68). Moreover, none of Plaintiff's treating physicians had imposed any permanent, functional limitations upon Plaintiff that were more severe than those contained within the ALJ's RFC finding. There is also minimal evidence of treatment for Plaintiff's back impairment after November 2002. Plaintiff does not contend, and the Court does not find, that the ALJ relied on any improper factors or that he significantly misrepresented the record in any manner in making his credibility assessment. Consequently, the Court finds that the ALJ acted well within his discretion in concluding that Plaintiff's testimony was not entirely credible.[5]

---

[5] Although Plaintiff alleged incontinence which required him to frequently use the restroom, the Court notes that the conditions of Plaintiff's neurogenic bladder and bowel involved urinary retention and constipation. By June 2002 the medical records indicate that Plaintiff's neurogenic bladder issues were resolved and his neurogenic bowel was resolving with the assistance of medication. Moreover, Plaintiff reported in April 2003 that he had no bladder or bowel incontinence. Plaintiff also alleged that he needed to use a cane all of the time for stability when standing and that his doctor had instructed him to use the cane. However, there is no record evidence that Plaintiff's doctor prescribed the cane. Furthermore, it was noted in several medical records that Plaintiff's gait was normal.

-17-

At step five, the ALJ determined that Plaintiff was not disabled because he could perform a significant number of jobs in the regional and national economy based upon the VE's testimony.  In response to a hypothetical posed by the ALJ, the VE testified that a person of Plaintiff's age, education, and RFC was capable of making a vocational adjustment to other work.  (Tr. 182).  The VE further testified that given these factors, the claimant could work at various jobs in the lower peninsula of Michigan having a light level of exertion such as a security guard (18,400 jobs), an assembly worker (9,000 jobs), and as a machine operator (5,600 jobs).  (Tr. 183).  These jobs also existed in significant numbers at the national level.  *Id.*

Where an ALJ poses a hypothetical question to a VE that fully and accurately incorporates a claimant's physical and mental limitations and the VE testifies that a person with such limitations is capable of performing a significant number of jobs in the national economy, such testimony is sufficient to support a finding that the claimant is not disabled. *Varley*, 820 F.2d at 779.

In forming a hypothetical, an ALJ must incorporate all physical and mental limitations reasonably established by the record.  *See Varley, supra*, 820 F.2d at 79-80. However, it is well-settled that a hypothetical "need not reflect the claimant's unsubstantiated complaints." *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Stanley v. Sec'y of Health & Human Servs.*, F.3d 115, 118 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypothetical").

The ALJ's hypothetical fully incorporated Plaintiff's exertional and environmental limitations as contained within the ALJ's RFC finding.  The ALJ's hypothetical also included more restrictive limitations as to the non-exertional limitations of climbing.  While the ALJ

-18-

determined that Plaintiff could occasionally climb ladders, scaffolds, and ropes, the ALJ's hypothetical referred to an individual who never had to perform such activities.  Furthermore, while the ALJ determined that Plaintiff could frequently climb stairs and ramps, the ALJ's hypothetical individual could only occasionally engage in such an activity.  Because the ALJ's hypothetical fully incorporated Plaintiff's limitations, the VE's responses provide substantial evidence to support the ALJ's non-disability determination.[6]

Plaintiff asserts that there is new evidence that would support an award of benefits in this case.  However, the Court cannot consider new evidence in determining whether substantial evidence supports the ALJ's non-disability determination.  *Cotten v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993).

---

[6]     The ALJ's hypothetical did not include any restrictions against balancing, stooping, kneeling, crouching, or crawling.  However, the ALJ determined that Plaintiff had the RFC to perform these activities only on a frequent basis.  Nevertheless, the Court concludes that such an error was harmless.  According to Social Security Ruling 83-14, 1983 WL 31254, the activities of balancing, stooping, kneeling, crouching, and crawling have limited impact upon work performed at the light exertional level.  At most, light jobs only require a claimant to perform such activities on an occasional basis.  Because Plaintiff could perform these activities frequently, there would be virtually no impact upon the jobs available to Plaintiff.  Moreover, balancing, stooping, kneeling, crouching, and crawling are not listed as physical requirements of the security guard or assembler workers jobs in the relevant vocational publication. *See* U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ( *SCO* ) Pt. A, at 45, 277, 302; App. C, at C-3 (1993) (the physical demand components of climbing, stooping, crouching and crawling are "not present" in the security guard job).  Balancing and kneeling are required only occasionally for one of the machine operator jobs identified by the VE.  *Id.* at 218.

-19-

The court may still remand the case to the ALJ to consider this additional evidence but only upon a showing that the evidence is new and material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  This is referred to as a "sentence six remand" under 42 U.S.C. § 405(g).  *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 549 (6th Cir. 2002).

The party seeking remand has the burden of showing that it is warranted.  *Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).  "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Foster*, 279 F.3d at 357 (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam).  "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore*, 865 F.2d 709, 711 (6th Cir. 1988) (citing *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)).

Plaintiff has made no attempt to satisfy his burden for a six sentence remand.  Indeed, Plaintiff has not provided this Court with any inkling as to what constitutes his new evidence. Therefore, the Court rejects Plaintiff's request for a six sentence remand based upon new evidence.

## VII.   <u>CONCLUSION</u>

The Court recommends that Defendant's Unopposed Motion for Summary Judgment

be **GRANTED** (Docket # 14) and that Plaintiff's complaint be **DISMISSED**.

**VIII.   NOTICE TO PARTIES**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: March 19, 2007                                s/ Mona K. Majzoub
                                                     MONA K. MAJZOUB
                                                     UNITED STATES MAGISTRATE JUDGE

-21-

**<u>PROOF OF SERVICE</u>**

       I hereby certify that a copy of this Report and Recommendation was served upon Erik Kubik and Counsel of Record on this date.

Dated: March 19, 2007                  <u>s/ Lisa C. Bartlett                    </u>
                                         Courtroom Deputy